[Cite as *State v. Knoefel*, 2015-Ohio-5207.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**LAKE COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2014-L-088** |
| KEVIN D. KNOEFEL, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 13 CR 000558.

Judgment: Affirmed.

*Charles E. Coulson,* Lake County Prosecutor, and *Teri R. Daniel,* Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Joseph C. Patituce, Megan M. Patituce,* and *Catherine Meehan,* Patituce & Associates, LLC, 26777 Lorain Road, Suite 708, North Olmsted, OH 44070 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1}   Defendant-appellant, Kevin D. Knoefel ("Kevin"), appeals his convictions for Sexual Battery, Complicity to Aggravated Murder, and Conspiracy to Commit Aggravated Murder, following a jury trial in the Lake County Court of Common Pleas. The issues before this court are whether recordings made in violation of California law are admissible in an Ohio criminal prosecution; whether the victim's statement that she

believed her husband and murderer were having an affair constitutes inadmissible hearsay; whether a warrant to search cell phones recovered at the scene of a murder meets the Fourth Amendment's probable cause and particularity requirements when police do not know who the phones belonged to and the murderer denies any memory of the murder; whether a conviction for Sexual Battery based on intercourse is supported by sufficient evidence where there was testimony that intercourse occurred when the victim was "17 or 18" and after she turned eighteen; whether inconsistencies in an eye witness' testimony render the verdicts against the manifest weight of the evidence; and whether trial counsel is ineffective for retracting a question and subpoenaing evidence already provided for in discovery. For the following reasons, we affirm the judgment of the court below.

{¶2} On August 8, 2013, the Lake County Grand Jury returned an Indictment against Kevin, charging him with the following: Sexual Battery (Counts 1 to 6), felonies of the third degree in violation of R.C. 2907.03(A)(5); Conspiracy to Commit Aggravated Murder (Count 7), a felony of the first degree in violation of R.C. 2923.01(A)(1); Conspiracy to Commit Aggravated Murder (Count 8), a felony of the first degree in violation of R.C. 2923.01(A)(2); Complicity to Aggravated Murder (Count 9), in violation of R.C. 2923.03(A)(1) and 2903.01(A); Complicity to Aggravated Murder (Count 10), in violation of R.C. 2923.03(A)(2) and 2903.01(A); and Complicity to Aggravated Murder (Count 11), in violation of R.C. 2923.03(A)(3).

{¶3} On August 16, 2013, Kevin appeared for arraignment and entered a plea of "Not Guilty" to the charges in the Indictment.

2

**{¶4}** On November 18, 2013, Kevin filed a Motion to Suppress. The State's Response was filed on December 2, 2013.

**{¶5}** On January 10 and 22, 2014, a hearing was held on the Motion to Suppress.

**{¶6}** On January 28, 2014, the trial court denied Kevin's Motion to Suppress. The court's Judgment Entry contained the following rulings relevant to this appeal:

**2. All recorded telephone calls and/or text messages from June 4, 2012, through June 6, 2012, which were recorded by law enforcement and their Agent while located within the State of California, and Det. Parmertor's telephone conversation with Defendant on June 6, 2012.**

Defendant asks this Court to suppress a recorded telephone call between himself and a cooperating witness for the State [Autumn Pavlik], who was in California at the time, a recorded call between himself and Det. Parmertor, and numerous recorded attempts by the cooperating witness to call and text Defendant. Defendant argues that the calls and texts made by the cooperating witness violated the laws of the State of California related to wiretapping and violate Defendant's Fourth, Fifth, and Sixth Amendment Rights.

The Court finds there is no requirement for a warrant for the recording of a telephone conversation between a consenting police informant and a non-consenting defendant. "Both federal and Ohio

3

courts have long permitted the warrantless recording of conversations between a cooperating informant and a defendant." *State v. Wallace*, 2012-Ohio-6270, 986 N.E.2d 498, 509 (7th Dist.), citing *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

In addition, the California law cited by Defendant is not relevant in this matter. Defendant is a resident of the State of Ohio and the crimes with which he is charged occurred in Ohio. Moreover, Defendant was located in Ohio both when he spoke with the cooperating witness and when he spoke with Det. Parmertor. Ohio's statute prohibiting the interception of communications, R.C. 2933.52(B)(3), states that it does not apply to "[a] law enforcement officer who intercepts a wire, oral, or electronic communication, if the officer is a party to the communication or if one of the parties to the communication has given prior consent to the interception by the officer." In this situation, there was clearly consent given by the cooperating witness and, as such, the statute does not apply. * * *

**4. All evidence seized as a result of the search and seizure of Defendant's cell phones/computers/electronic media contents and/or contents of any wire or electronic communication to the "subscriber" and/or these devices on November 20, 201[2], or pursuant to search warrants issued on or about that date.**

4

Defendant makes the following arguments * * *: * * * (2) the affidavit used to obtain the warrants does not support probable cause * * *.

The Court finds * * * the affidavit used to obtain the warrant does support probable cause. Three cell phones that were seized as a result of the November 20, 2012 [warrant] were collected from the master bedroom [where the murder occurred], and the identity of the owner/user of each phone was not known at the time. The police were looking for communications between the victim and the sole suspect at that point, Sabrina Zunich, or between Ms. Zunich and third parties, because Ms. Zunich stated in the interview following her arrest that she did not have any recollection of the incident that took place between her and the victim.

{¶7} Kevin's trial was conducted over the following dates: May 29, June 2 through 6, and June 9 through 11, 2014. The following testimony was given at trial on behalf of the State:

{¶8} Theresa Ann Mann, attendance secretary for South High School in the Willoughby-Eastlake City School District, testified that, on November 14, 2012, Zunich signed herself out for early release at 8:54[1] and signed herself back in at 9:05.

{¶9} Ken Melvin, an intervention specialist (special education teacher) at South High School and a part-time police officer for the City of Willoughby, was Zunich's instructor in the fall of 2012. Melvin described Zunich as a "B" student without

---

1. According to the trial transcript, Mann testified that Zunich signed herself out at 8:05. According to State's Exhibit 2, from which Mann was testifying, Zunich signed herself out at 8:54.

behavioral issues. On November 14, Melvin observed Kevin and Zunich speaking to each other on a low wall outside the school building, noting that it was unusual for a parent to meet with a student in such circumstances during the school day. Later, Kevin approached Zunich inside the building to speak with her. Melvin advised Kevin that he would have to sign in at the school office, which Kevin did.

{¶10} Ashley Onion, a dispatcher with the Willoughby Hills Police Department, testified that at about 1:15 a.m. on November 16, 2012, she received a 911 call from 2518 Chagrin Drive. A recording of the call was played for the jury. Onion further testified that she received a call from Kevin, "inquiring about his girls." He was advised that they could be picked up from the police department and he did so at about 5:00 a.m.

{¶11} Patrolman Randolph Mullenax of the Willoughby Hills Police Department testified that at 1:17 a.m. on November 16, 2012, he received a dispatch about an assault in progress at 2518 Chagrin Drive. At the scene, Mullenax apprehended Zunich and discovered the body of Lisa Knoefel. The murder weapon was a fifteen-inch (nine-inch blade) convex, serrated knife, without a hilt.

{¶12} Patrolman Mullenax met Kevin later that morning in the station lobby. He described Kevin's demeanor as "relatively calm": Kevin "gave me a strange preface saying that he was some kind of EMT before and he had seen stuff like this numerous times and I wasn't going to tell him anything that he hasn't seen before and he wanted to know every detail about what happened."

{¶13} Officer Michael Sevel of the Waite Hill Police Department at the time of the murder testified that he responded to the dispatch to 2518 Chagrin Drive on the morning

6

of November 16, 2012. Sevel noted that the pants Zunich was wearing that night had tears in them.

{¶14} Steve Lucic, a fireman and paramedic for the City of Willoughby Hills, was on the scene on November 16, 2012. Lucic testified that, upon arrival, Lisa Knoefel's EKG was asystole (or flatline) and that paramedics were unable to run an IV because her veins had collapsed as a result of blood loss.

{¶15} Tom Smith, a firefighter paramedic with the Kirtland Fire Department, treated Zunich on the night of the murder. Zunich had various minor lacerations on her hands, the back of her neck, and on her legs above the knees. When Smith first received custody of Zunich from the police she was hyperventilating. She ignored most of the questions Smith asked her. Thereafter, she was exhausted and dozing off.

{¶16} Dr. Joseph Andrew Felo, a forensic pathologist with the Cuyahoga County Medical Examiner's Office, supervised the autopsy of Lisa Knoefel (age 41) on behalf of the Lake County Coroner's Office. Dr. Felo identified a lethal injury on her mandible (jaw) area, which penetrated deep enough to sever the carotid artery leading to the brain. There was another lethal wound in her breast that penetrated to and collapsed the lung underneath. Several of the cuts were described as complex, meaning "that either the knife or the instrument was twisting and/or the person receiving those are twisting." There were numerous defensive injuries on both her hands and legs. Lisa Knoefel's wounds were consistent with the types of wounds which the knife recovered at the scene would cause. Dr. Felo opined the cause of death was "multiple stab and incised wounds, at least 178 in total, of head and neck, torso and extremities with musculoskeletal, vascular and visceral injuries."

7

**{¶17}** Erica Gaiter supervised Lisa Knoefel as a social worker in the ongoing sex abuse department for Cuyahoga County Division of Job and Family Services and interacted with her on a daily basis. Gaiter testified that Lisa appeared distracted – "trying to stay focused" – in the weeks prior to her murder.

**{¶18}** The day after the murder (Saturday, November 17), Gaiter took food to Kevin's mother's house. Gaiter noted that Kevin's demeanor appeared "normal," that he was neither sorrowful nor upset. Gaiter also noted a picture of Zunich on the refrigerator. Gaiter described Kevin's demeanor at Lisa's funeral as "emotionless."

**{¶19}** Kayleen Lessmenn worked with Lisa Knoefel for thirteen years as a sex abuse social worker at Cuyahoga Children and Family Services. Lessmenn testified that, during the course of 2012, Lisa would more often step away from her desk to take private calls, which were sometimes upsetting to her. The day after the murder, Lessmenn was speaking with Kevin Knoefel and he made the comment, in a "matter of fact" way, that $50,000 (Lisa's salary) would be "a lot to make up."

**{¶20}** Pamela Brown, a social worker with Cuyahoga Children and Family Services and branch president of the AFSCME (public employee trade union), testified that, on the morning of November 16, 2012, she received a call from Kevin inquiring as to what paperwork was necessary to make a claim on Lisa's life insurance policy with the union. Brown testified that the value of the policy was $30,000 or $35,000, depending on the employee's classification.

**{¶21}** Jill Reynolds was a benefits specialist with Gordon Food Services, where Kevin Knoefel worked as a transit driver. On November 16, 2012, she received a call from Kevin, advising that his wife had died and that he wanted to file an insurance

claim. Reynolds asked about the cause of death, since there was accidental death and dismemberment coverage. Kevin replied that he did not know. Gordon Food Service provided $10,000 of basic life coverage for Lisa and Kevin had purchased $60,000 in supplemental life. The amount of accidental death and dismemberment coverage matched the value of the life policies. Reynolds sent Kevin the paperwork necessary to file a claim and it was returned on November 23, 2012.

**{¶22}** Deborah Amiott Jordan, a team and group leader of Gordon Food Services' insurer, Hartford Insurance Company, processed Kevin's claim. Hartford issued three checks to pay the claim: one to Kevin for $70,000; another to Kevin for $63,332; and a third to Davis-Babcock Funeral Home for $6,682.77.

**{¶23}** Diana Fields, a senior claims examiner with American General Life, testified that on November 16, 2012, Kevin reported a claim on a $250,000 life policy insuring Lisa Knoefel. The policy was issued on May 16, 2012. Hartford paid $251,685.10 on Kevin's claim.

**{¶24}** Christopher Eddy, a team leader for Guardian Life Insurance Company, testified that Guardian Life provides insurance for Cuyahoga Children and Family Services through a self-administered group life policy. Guardian Life issued a check to Kevin for $249,542.34 in payment for Kevin's claim.

**{¶25}** Donna Castiglione, an assistant director of member services with the Ohio Public Employee Retirement System, testified that, on November 19, 2012, Kevin notified OPERS of Lisa Knoefel's death.

{¶26} Chuck Fullen, supervisor of survivor benefits for OPERS, testified that Kevin was entitled to a per month benefit of $1,030.51 due to Lisa's membership in OPERS.

{¶27} Ryan Kenneth Dodge, a customer service representative for the Frank Zingale Insurance Agency, testified that Kevin Knoefel called the agency on November 16, 2012, and requested that claim forms be delivered that day. The forms were delivered to Kevin's sister, who apologized because Kevin was too distraught to accept them at the moment.

{¶28} Frank Zingale, an agent for Farmers Insurance, testified that Kevin was paid $150,286.50 on a term life insurance policy purchased in 2009 for Lisa Knoefel. Zingale testified that, in the months following Lisa's death, Kevin changed the policy on the home at 2518 Chagrin Drive from renters to homeowners insurance and installed a swimming pool. Kevin also took out automobile insurance on a 2013 Cruze, a 2011 Malibu, and two campers.

{¶29} Patrolman Jamie Onion of the Willoughby Hills Police Department testified that on September 15, 2012, he went to 2518 Chagrin Drive in response to a domestic call. Onion spoke with Kevin at the scene. Kevin explained that he and his wife, Lisa, had had an argument regarding Megan, Lisa's thirteen-year-old daughter from a prior marriage. Kevin had grabbed Megan by the back of the neck and walked her to her room. Lisa accused Kevin of choking Megan. Although the dispute was over and Lisa was no longer at the residence, Kevin wanted the incident documented because it could lead to divorce and affect his custody of Hailey, his three-year-old daughter with Lisa.

{¶30} Detective Brian Jackson of the Willoughby Hills Police Department testified that he met Kevin at 2518 Chagrin Drive on November 17, 2012. Kevin wanted to enter the house and asked the police to ensure there was no media presence. Jackson discouraged Kevin from entering the house because, although the scene had been released, it had not been cleaned up. Kevin displayed no emotion and said that he wanted to see it for himself. Thereupon, Jackson departed.

{¶31} Nicole Corbett, a social worker for Lake County Department of Job and Family Services is currently a supervisor at the Caley Home. In the summer of 2010, Corbett became Zunich's ongoing social worker. Zunich was a resident at the Caley Home for about a year until her placement with the Knoefels, licensed foster parents, in July 2011. Zunich was eager to leave the Caley Home and be placed with a family. Zunich initially attended Community Academy for school. Beginning in the fall of 2012, she began attending South High School as a senior.

{¶32} In October 2012, Kevin contacted Corbett and advised that he and Lisa were considering divorce and asked if Zunich would be able to remain with him if he and Lisa separated. Corbett replied that it was a possibility.

{¶33} On October 26, 2012, Corbett conducted a home visit at the Knoefel household. Corbett had no concerns regarding Zunich, as she was doing well in school, attending counseling, and passing her drug screens. Zunich wished to remain in the custody of Lake Job and Family Services and to continue her placement with the Knoefels after her eighteenth birthday (October 27).

{¶34} Corbett testified that, prior to her placement with the Knoefels, Zunich was residing with her grandmother. Zunich was removed from the grandmother's home due

11

to the grandmother's age and behavioral issues, such as Zunich stealing money. At the Caley House, Zunich had psychological (heard voices, anger), substance abuse, and behavioral issues (lying and being manipulative).

{¶35} Jay Leonard, a corrections officer at the Lake County Jail, testified that, on the morning of November 17, 2012, Kevin came to the jail and asked to visit Zunich. Leonard advised that Zunich did not have any more available visiting time on that date. Kevin stated that he needed to see her and appeared anxious. After waiting a few minutes in the lobby, Kevin returned to the window separating Leonard from visitors and, more anxiously, stated that "he really needed to see or visit her, put his hands down on the table and said you don't understand, I do need to see her cause I'm her [foster] father." Kevin also arranged to have his name added to Zunich's visitor list.

{¶36} John Wooley, a general district manager for Chase Bank, testified that, on July 9, 2012, a high school checking account in the names of Sabrina Zunich and Kevin Knoefel was created. Wooley also testified regarding various joint accounts owned by Kevin and Lisa Knoefel and, after Lisa's death, by Kevin and Judith Knoefel (Kevin's mother).

{¶37} Denise Burris, a benefits coordinator for various Cuyahoga County agencies, testified that Lisa Knoefel first acquired life insurance benefits (the Guardian policy) through the county in March 2012. Lisa applied for the insurance during an open enrollment period in November 2011.

{¶38} David Strunk testified that he was a "close friend" of Kevin Knoefel for sixteen years.

**{¶39}** In October 2012, their families, including Zunich, went on a camping trip to Rocky Fork Ranch Resort in Kimbolton, Ohio. During the trip, Kevin confided in him that he and Lisa were fighting and she believed that he was having an affair with Zunich. Kevin further confided that he was considering seeing a divorce attorney and showed Strunk modeling pictures of Zunich. During the camping trip, Kevin told Strunk that Zunich picked out underwear for him that she thought would be comfortable.

**{¶40}** Strunk met and spoke with Kevin on the morning of November 16, 2012, at his mother's house. Kevin was upset and crying, and told him that he had already made arrangements to meet with a funeral home. Kevin asked Strunk to obtain some information regarding a life insurance policy on Lisa. Kevin also asked Strunk to shut down Lisa's Facebook and email accounts, so that he would not have to deal with people leaving messages.

**{¶41}** That afternoon, Strunk received the insurance forms delivered to Kevin's mother's house. Strunk then accompanied Kevin to the funeral home. Arrangements were made for Lisa's funeral on Tuesday, November 20, from 5:00 to 7:00 p.m. Later, Kevin discussed going to the jail to visit Zunich "to make sure she was okay and to let her know that he was still there for her and that he hadn't given up on her." Kevin had already contacted the Willoughby Hills Police and asked about Zunich's location and visiting regulations.

**{¶42}** The next day (Saturday), Strunk took Kevin to the Lake County Jail. When he was refused admission, Kevin became upset and wanted to know who had visited Zunich before him. Kevin then wrote a note for Zunich, but the note could not be delivered. Leaving the jail, they went to an AT&T store on Mayfield Road to get a new

battery for Kevin's phone, and to an AT&T store in Willoughby to deactivate Lisa's and Zunich's phone lines. During the errands, Kevin contacted Zunich's relatives and asked them to let Zunich know that he was not ready to give up on her and would be there for her.

**{¶43}** That afternoon, Kevin arranged to visit the home on 2518 Chagrin Drive to pick up some clothing and to see the room where Lisa was murdered. Kevin explained he wanted to see the room because it would give him closure and help him move on. After viewing the bedroom for a few minutes, Kevin stated he wanted to have the house cleaned and Lisa's belongings moved out. A clean-up crew had substantially cleaned the house on that Saturday and Lisa's belongings were removed on Sunday.

**{¶44}** On November 19 (Monday), Strunk asked Kevin if he had any sort of inappropriate relationship with Zunich. Kevin did not reply to the question and changed the topic of conversation.

**{¶45}** Strunk testified that, in December 2012, he was contacted by the police and asked to make a statement. About that time, Strunk and Kevin became estranged.

**{¶46}** Joe Becka testified that, in November 2012, he worked as a field specialist for Rainbow International, which performs remediation services including trauma scene clean up. On the morning of November 17, he met with Kevin with respect to cleaning the residence at 2518 Chagrin Drive. Kevin advised that he had a $250,000 life insurance policy and that cost did not matter, but he wanted the home cleaned. Kevin's manner was "matter of fact." During the cleaning, Kevin asked Becka to look for a finger and a ring that might be in the bedroom.

14

**{¶47}** Elliott Lambert, a general manager with Rainbow International, assisted Becka in cleaning the Chagrin Drive residence. Lambert noted Kevin's calmness during their interaction.

**{¶48}** Tom Walsh, chief investigator at the Lake County Prosecutor's Office, participated in the post-arrest interview of Kevin Knoefel on August 9, 2013. A DVD of the interview was played for the jury.

**{¶49}** Sabrina Zunich testified that, in August 2013, she entered into a cooperation agreement with the State of Ohio, whereby, in exchange for her testimony against Kevin, she would be allowed to plead to Aggravated Murder and the State would recommend a sentence of life with eligibility for parole after thirty years.

**{¶50}** When placed in the Knoefels' home, Zunich was taking nine different medications for bipolar disorder, ADHD, and insomnia. Although she was subject to fluctuating mood swings, these were controlled while in the Knoefels' home. For a period of about one month at the Caley Home, Zunich heard voices as a side-effect of medicines she was taking at the time.

**{¶51}** Zunich testified that she interacted better with Kevin Knoefel, than with Lisa, who made her feel like an outsider and was less approachable. Zunich was interested in possibly becoming a massotherapist and Kevin, being a truck driver, would complain about pain in his thighs. On Kevin's suggestion, Zunich began the habit of massaging his thighs. Over a period of a couple of months, she began massaging his genitalia. This occurred in various rooms of the Chagrin Drive residence.

**{¶52}** In early 2012, Zunich went on a camping trip with the Knoefels to North Carolina. During this trip, Zunich and Kevin began masturbating each other. After this,

Zunich began to have feelings for Kevin as more than just a foster father. She identified Kevin among the contacts on her iPod as "Kevin love" and bought him underwear.

{¶53} Throughout the course of 2012, there was increased tension between Zunich and Lisa and Lisa's daughter, Megan. Zunich and Lisa began to argue regularly. There was an incident where Lisa restrained Zunich physically which resulted in Zunich making a statement to the police. Zunich had a strong desire to be a mother figure to Hailey, and, shortly before the murder, Lisa took Hailey away from Zunich.

{¶54} During the summer of 2012, Zunich opened a bank account with Kevin as a cosigner. Zunich deposited money she made working at a summer job and social security payments she received after her (biological) father died.

{¶55} Zunich testified that about four months before Lisa's murder, she began having a sexual relationship with Kevin, but could not otherwise identify when that relationship started. She described the activity from April to August 2012 as "blow jobs and masturbation." Zunich testified to having vaginal intercourse with Kevin, when she "was 17 or 18" and after she turned eighteen.

{¶56} In the fall of 2012, Zunich began attending South High School. Kevin would usually drive Zunich to school in the morning, a ten-minute drive, during which time they would engage in sexual activity ("blow job and fingering"). Zunich recalled a specific instance of sexual activity between her and Kevin when she was hospitalized in September 2012 for appendicitis. At this time, Kevin and Lisa began to argue more frequently and Lisa expressed her wish that Zunich leave the house.

16

{¶57} In September, Kevin confided in Zunich that there were life insurance policies on Lisa worth $750,000 and that she "would be worth more dead than alive." According to Kevin, if Lisa was gone, they could live together and raise a family.

{¶58} Zunich described a conversation between herself, Kevin, and a friend from high school, Autumn Pavlik, that occurred in Kevin's car when they were going to a Chinese buffet. The three discussed having a friend of Pavlik's kill Lisa. Nothing more occurred in furtherance of this plot. In October 2012, Pavlik moved to California.

{¶59} On October 27, 2012, Zunich turned eighteen but elected to continue her placement in the Knoefel home. Zunich feared that Lisa would force her to leave the home.

{¶60} At sometime after her birthday, Kevin confided in Zunich that he did not love Lisa anymore, but did not want to get a divorce because he would have to share custody of Hailey (Kevin's three-year-old daughter with Lisa).

{¶61} In early November, Kevin and Zunich discussed using a pistol to kill Lisa. Zunich was supposed to use a pistol that could not be traced to Kevin and to wrap a pillow around it to muffle the sound. She would then hide the gun in the basement where Kevin could retrieve and dispose of it. In court, Zunich identified the gun Kevin intended her to use. Kevin intended to take Zunich to a shooting range to practice but it never happened because Lisa wanted to accompany Kevin to the range.

{¶62} On the morning before the night of the murder, Kevin was driving Zunich to school when he stopped and described a fight he had with Lisa. Kevin was crying and laid or banged his head on the steering wheel. He said he "can't stand any more so I'm going to kill myself if she's not dead." Zunich replied that she would kill Lisa. Kevin

17

had previously instructed Zunich as to how to kill Lisa: if Lisa was laying on her side, drive the knife between her shoulder blades; if Lisa was laying on her back, stab her in her throat; rotate the knife after stabbing it into her body; attack her at night, after she is asleep but before the time Hailey wakes up and comes in her bed; wear tight clothing that covers your whole body; leave your clothes in a bag outside the garage; make it look like a burglary by emptying out clothes drawers and the jewelry box; and, if you are caught, play insanity or self-defense.

{¶63} Zunich executed these instructions on the morning of November 16, 2012. Although she anticipated murdering Lisa with a single stab wound, Lisa fought back. The commotion awoke Megan who pleaded with Zunich to stop and called the police. Zunich continued to stab Lisa until she was sure she was dead. When Zunich heard the police outside the bedroom, she cut herself to make it look like self-defense. She also claimed to have blacked out and to not remember anything about the attack, as instructed by Kevin.

{¶64} Following her arrest, Zunich began to feel abandoned by Kevin. She was resentful because he did not do anything to help her or support her. In May 2013, Zunich informed the police of Kevin's involvement in Lisa's murder in order to serve justice: "because I'm not the only one who did this."

{¶65} Francis Corley, Zunich's maternal aunt, testified that she had concerns about Zunich's relationship with Kevin Knoefel, because they had opened a joint bank account and Zunich had lent him money. Zunich also revealed knowledge of the life insurance policies on Lisa prior to the murder. Following the murder, Kevin asked her to tell Zunich that he loved her and was not giving up on her. In March 2013, Corley asked

Kevin directly about his relationship with Zunich. He responded "something to the effect that his neighbors were asking him questions too," and the subject was changed.

{¶66} Corley testified that Zunich was placed in the Caley Home because her grandmother could not control her and, for similar reasons, she declined to have Zunich placed in her home.

{¶67} Willie Smith, a social worker with the Willoughby-Eastlake School District, testified that he had contact with Zunich on a daily basis at Community Academy during the 2011-2012 school year. Smith recalled an occasion when Kevin Knoefel was at the school to help resolve a dispute between Zunich and some of the other students. He noted that Zunich sat on his lap between his legs.

{¶68} For the 2012-2013 school year, Smith's responsibilities included South High School as well. On one occasion, Smith recalled Zunich being upset because Lisa Knoefel was going to kick her out of the house. On another occasion, in late October or early November, Smith recalled Zunich saying Kevin was going to divorce Lisa, but that she did not know it yet.

{¶69} Latasha Stewart, a youth services coordinator for Catholic Charities, supervised Zunich's employment during the summer of 2012. Stewart met with Zunich on November 9, 2012. During this meeting, Zunich mentioned that Lisa did not like her relationship with Kevin. Stewart asked Zunich if there was anything inappropriate about the relationship and Zunich denied that there was.

{¶70} Melissa Jevack, a probation officer with the Lake County Juvenile Court, was Zunich's probation officer since 2009. Jevack testified that in July or August 2012 she received a call from Kevin. He was noticeably agitated because Zunich was dating

19

or wanted to date an older boy. Kevin asked Jevack to speak with Zunich. When Jevack spoke to Zunich, she began to cry and said she did not understand why it was a "big deal" because she was almost eighteen. Jevack advised Zunich that she must abide by Kevin's rules since she was living in his home. Jevack testified that she did not have difficulties with Zunich during the period of her probation.

**{¶71}** Jamie Walsh, a digital evidence examiner with the Lake County Crime Laboratory, searched twenty-two different electronic devices from the Knoefel home but found nothing implicating Kevin in Lisa's murder.

**{¶72}** Autumn Pavlik was a friend of Zunich's from school in 2012 until October, when she moved to California. Pavlik testified about an incident when Kevin was driving her and Zunich to a Chinese buffet and Kevin showed her a gun that he kept in his truck.

**{¶73}** Pavlik testified that Zunich told her that Kevin and Lisa fought over the way he would talk to her, Kevin and Lisa were going to get a divorce, and Lisa was worth more dead than alive. Zunich asked Pavlik if she was able to hire a hit man. Zunich would bring up the topic of hiring a hit man repeatedly.

**{¶74}** About a week before she left for California, Pavlik and Zunich were discussing doing a drug run to get a hit man. Pavlik, who was not interested in obtaining a hit man, told Zunich she needed a ride to do the run. Shortly thereafter, Kevin called her and asked if she needed a ride to do the run.

**{¶75}** After Lisa's murder, Pavlik cooperated with the police in recording telephone calls to Kevin from California. Pavlik testified that she attempted to contact Kevin by phone and by text on multiple other occasions, but without response. On June

4, 2013, Kevin contacted Pavlik by phone. A recording of the conversation was played for the jury.

{¶76} On July 10, 2013, Pavlik visited Kevin in Ohio at his home. The conversation was video-recorded and played for the jury. During the conversation, Pavlik tells Kevin that the police have been trying to contact her and asks what she should tell them about the hit man and about Zunich and his relationship. Kevin responds that she should tell them the truth because he does not know what Zunich said to her.

{¶77} Pavlik testified that when Zunich proposed hiring a hit man to kill Lisa, she pretended to go along with the idea although she had no serious intention of aiding Zunich. Pavlik also admitted that she did not do anything to dissuade or stop Zunich other than telling her that she did not think killing Lisa was a good idea.

{¶78} Detective Ron Parmertor of the Willoughby Hills Police Department testified that he responded to the scene at 2518 Chagrin Drive on the morning of November 16, 2012. Parmertor spoke with Zunich who denied having any recollection of the events of that evening. He also collected prescriptions for Vyvanse (for ADHD) and Lamotrigine (for bipolar) belonging to Zunich.

{¶79} Detective Parmertor testified regarding the number of communications (cellular calls and texts) between Kevin, Lisa, and Zunich in the time before the murder. Between November 1 and 16, 2012, there were 1,491 communications between Kevin and Zunich, 78 of which occurred between 7:12 p.m. on November 15 and 12:46 a.m. on November 16. Between November 1 and 16, 2012, there were 201 communications between Kevin and Lisa, and no communications at all between 7:12 p.m. on November

21

15 and 12:46 a.m. on November 16. Parmertor conceded that Kevin and Lisa worked conflicting shifts and that his statistics regarding communications between Kevin and Lisa did not include calls made using the house's land line.

**{¶80}** Detective Parmertor testified that Zunich first brought to the attention of law enforcement the number of insurance policies on Lisa's life during the proffer negotiations in May 2013. During the initial interview with Autumn Pavlik in early 2013, Parmertor noted that it was Pavlik who raised the topic of hiring a hit man.

**{¶81}** On June 6, 2013, two days after Kevin spoke with Pavlik, Detective Parmertor called Kevin and asked him if he was familiar with certain acquaintances of Zunich. When he mentioned Pavlik's name, Kevin responded that her last name did not "ring a bell," but he thought Zunich had a friend named Autumn from school who "disappeared." A recording of Parmertor's conversation with Kevin was played for the jury.

**{¶82}** In August 2013, Detective Parmertor executed a search warrant on Kevin's residence. He noted extensive remodeling since the time of the murder in November 2012. Parmertor also noted that since the murder, Kevin registered four vehicles: a 2011 Chevy Malibu, a 2013 Chevy Cruze, a 2011 Chevy Silverado, and a 2013 Rockwood travel trailer. Parmertor conceded that some remodeling was already being done at the time of the murder.

**{¶83}** Detective Parmertor acknowledged that Pavlik thought that her recorded conversations with Kevin went "horrible" because she did not get anything out of him. Parmertor also acknowledged the search of Kevin's residence, including electronics, did not reveal anything illegal or incriminating.

22

**{¶84}** Douglas Rohde, supervisor of chemistry and toxicology at the Lake County Crime Laboratory in Painesville, Ohio, testified to the presence of amphetamines in Zunich's urine. Rohde further testified that the primary use of Vyvanse is to treat ADHD and that a secondary use of Lamotrigine is for bipolar disorder (the primary use is for seizure disorder).

**{¶85}** Doctor Wendy Adams, an assistant laboratory director at NMS Labs in Willow Grove, Pennsylvania, testified that concentrations of Lamotrigine and amphetamine in Zunich's blood were consistent with the normal therapeutic use of her prescription medication. Dr. Adams was unable, however, to identify the source of the amphetamine.

**{¶86}** The following testimony was presented on behalf of Kevin:

**{¶87}** Kris Ann Sutton, Kevin's sister, met Kevin at their mother's house early on the morning of November 16, 2012. She described Kevin as crying and emotionally distraught. Lisa's funeral arrangements were made in consultation and with the consent of the family.

**{¶88}** Sutton testified that she did not have concerns about Kevin and Lisa's marriage, but admitted that she had no contact with Kevin and his family for about a year prior to Lisa's murder.

**{¶89}** Willow Dennis, a student at South High School, testified that she rode the bus with Zunich. Dennis recalled Zunich on the bus stated that she hated her mom (Lisa) and that she was going to kill her.

**{¶90}** Linda Cover owned the house at 2518 Chagrin Drive that Kevin was renting under a "rent option to purchase" land contract at the time of Lisa's murder.

23

{¶91} Carrie Ward, an ongoing social worker with the Cuyahoga County Department of Job and Family Services, knew Lisa and her family socially. Ward testified that Lisa had concerns about Zunich's interactions with her children. Zunich would fight with Megan and play the role of mother to Hailey. Lisa was also frustrated in regards to her relationship with Kevin.

{¶92} On June 11, 2014, the jury returned a verdict finding Kevin guilty on all counts of the Indictment.

{¶93} On August 6, 2014, a sentencing hearing was held. On the State's request, the trial court merged Counts 7 (Conspiracy to Commit Aggravated Murder), 8 (Conspiracy to Commit Aggravated Murder), 10 (Complicity to Aggravated Murder), and 11 (Complicity to Aggravated Murder) into Count 9 (Complicity to Aggravated Murder). The court sentenced Kevin to two years imprisonment for each of the six Counts of Sexual Battery and to life with parole eligibility after thirty years for Complicity to Aggravated Murder. All sentences were ordered to be served consecutively. The court further advised Kevin of post-release control, ordered him to pay the costs of prosecution, and found him to be a Tier III Sex Offender.

{¶94} On August 29, 2014, Kevin filed his Notice of Appeal. On appeal, Kevin raises the following assignments of error:

{¶95} "[1.] The trial court erred in finding that the calls made and recorded by Detective Ron Parmertor and Autumn Pavlik while located in the State of California did not violate Mr. Knoefel's Fourth Amendment Rights."

{¶96} "[2.] The trial court erred when it admitted the hearsay statements of Lisa Knoefel through the testimony of David Strunk."

{¶97} "[3.] The trial court erred by denying Mr. Knoefel's Motion to Suppress text messages retrieved pursuant to a search warrant obtained without probable cause and by admitting these text messages as evidence at trial."

{¶98} "[4.] The jury erred in finding Mr. Knoefel guilty as to count three of the indictment as the State failed to present legally sufficient evidence to sustain a conviction."

{¶99} "[5.] The jury erred in finding Mr. Knoefel guilty as to all counts of the indictment as such findings were against the manifest weight of the evidence."

{¶100} "[6.] Mr. Knoefel's trial counsel provided ineffective assistance."

{¶101} "[7.] Cumulative error materially prejudiced Mr. Knoefel such that he did not receive a fair trial."

{¶102} Kevin's first assignment of error challenges the trial court's denial of his Motion to Suppress with respect to the phone calls made and recorded by Detective Parmertor and Autumn Pavlik while they were in the State of California. Kevin contends that the recordings were made in violation of California law and, thus, are inadmissible.

{¶103} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. The trial court's "findings of fact are to be accepted if they are supported by competent, credible evidence," whereas the appellate court is "to independently determine whether [the facts as determined by the trial court] satisfy the applicable legal standard." *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, 833 N.E.2d 1216, ¶ 41; *State v. Yu*, 11th Dist. Geauga Nos. 2014-G-3209 and 2014-G-3210, 2015-Ohio-637, ¶ 17.

{¶104} Although Kevin characterizes the admission of these conversations as "a violation of [his] Fourth Amendment rights," his argument does not rest on the Fourth Amendment but, rather, California statutory law. California's Eavesdropping Statute prohibits the recording of a confidential conversation, defined as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto," "without the consent of all parties to a confidential communication." Cal.Penal Code 632(a) and (c). "Except as proof in an action or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative, or other proceeding." Cal.Penal Code 632(d).

{¶105} Under Ohio law, in contrast, wire, oral, or electronic communications may be intercepted by a police officer, "if the officer is a party to the communication or if one of the parties to the communication has given prior consent to the interception by the officer." R.C. 2933.52(B)(3).

{¶106} Kevin contends that California law should govern the suppression of these recordings since they were recorded in California, although Kevin was in Ohio when they were made. Kevin cites to the case of *State v. Dew*, 7th Dist. Mahoning No. 08 MA 72, 2009-Ohio-6537, in which the court upheld the admission of recorded conversations in a similar context. In *Dew*, the calls originated in California but were recorded in Ohio. The court emphasized this fact in affirming the admissibility of the recordings, noting that "R.C. 2933.53," authorizing "the prosecuting attorney of the county in which an

interception is to take place" to apply for a search warrant, "makes no mention of the location of the callers, but rather focuses on the location of interception." *Id.* at ¶ 85.

**{¶107}** We find no compelling authority for the exclusion of the recordings in the present case.

**{¶108}** As acknowledged by the *Dew* court, suppression of such recordings is not mandated under Ohio or federal law. "[N]either the federal constitution, nor the Ohio constitution requires the suppression of evidence obtained by the warrantless recording of a telephone conversation between a consenting police informant and a non-consenting defendant." *Id.* at ¶ 81, citing *State v. Geraldo*, 68 Ohio St.2d 120, 429 N.E.2d 141 (1981), syllabus. Accordingly, justification for suppressing the recordings only exists if this court were to determine that California law should somehow apply in an Ohio criminal prosecution.

**{¶109}** "Most courts facing 'conflict of laws' situations in the context of suppression issues analyze whether suppression under the particular facts of the case would further the purpose of the exclusionary rule," i.e., the deterrence of police misconduct. *State v. Harvin*, 547 S.E.2d 497, 499 (S.C.2001). This approach is consistent with federal practice, which holds that "additional protections a state provides its citizens against search and seizure are irrelevant in federal prosecutions," provided that there was no violation of the Fourth Amendment. *United States v. Master*, 614 F.3d 236, 239 (6th Cir.2010).

**{¶110}** Ohio law recognizes that the "exclusionary rule is a judicially created sanction designed to protect Fourth Amendment rights through its deterrent effect." *State v. Brown*, 142 Ohio St.3d 92, 2015-Ohio-486, 28 N.E.3d 81, ¶ 12. Thus, "the

exclusionary rule will not ordinarily be applied to evidence which is the product of police conduct violative of state law but not violative of constitutional rights." *Kettering v. Hollen*, 64 Ohio St.2d 232, 235, 416 N.E.2d 598 (1980); *State v. Droste*, 83 Ohio St.3d 36, 40, 697 N.E.2d 620 (1998) ("absent a violation of a constitutional right, the violation of a statute does not invoke the exclusionary rule").

{¶111} Here, Detective Parmertor's conduct violated neither Ohio nor federal law. In the absence of some deterrent effect, the alleged violation of California law in the context of an Ohio criminal prosecution is insufficient to invoke the application of the exclusionary rule.

{¶112} The first assignment of error is without merit.

{¶113} Under the second assignment of error, Kevin argues that it was prejudicial error for the trial court to allow the testimony of the State's witness, David Strunk, that Kevin confided in him that Lisa suspected him of having an affair with Zunich, over the objection of defense counsel. Kevin maintains that Strunk's testimony constituted double hearsay, i.e., he testified to what Kevin said that Lisa had said. Specifically, Strunk testified: "He [Kevin] told me * * * that Lisa had approached him and stated that she had concerns that he was messing around with Sabrina."

{¶114} "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the

28

Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 802.

{¶115} "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991).

{¶116} The State responds that Lisa's statements were not hearsay, because they were not offered by the State to prove the truth of the matter asserted: "[t]o be sure, Lisa's statements were offered to show the state of Appellant and Lisa's marriage, not to establish that Sabrina and Appellant were actually having an affair." Appellee's brief at 10.

{¶117} Strictly speaking, Strunk's testimony was probative of whether Lisa suspected Kevin and Zunich of having an affair, rather than of whether Kevin and Zunich were actually having an affair. It cannot be denied, however, that Lisa's suspicions of Kevin and Zunich's relationship tended to bolster the State's case that they were, in fact, engaged in a sexual relationship. Moreover, the existence of such a relationship was crucial to six Counts of the Indictment charging Kevin with Sexual Battery. In contrast, whether Lisa suspected an affair was of little relevance to the ultimate issues of the case. Accordingly, while the statement may not constitute hearsay, there was a legitimate concern about the probative value of the statement being outweighed by the danger of unfair prejudice. Evid.R. 403(A).

{¶118} Assuming, arguendo, that Strunk's testimony regarding Lisa's statement should have been excluded, we find the error harmless beyond a reasonable doubt.

29

Crim.R. 52(A) ("[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded"). That Lisa was disturbed by the nature of Kevin and Zunich's relationship was demonstrated by other evidence in the case. Zunich testified to Lisa's distrust of her relationship with Kevin. Zunich's testimony was corroborated by the evidence of text messages retrieved from Lisa's iPhone. See the following texts sent from Lisa to Kevin: "Cut the damn. Cord spending too much time with her and less with your real family thanks a lot" (sent 11/10/2012); "Why is it U never think about doing things with me I always last when I should be first" (sent 11/7/2012); "Did u call and just want to speak to Bri [Zunich]" (sent 10/9/2012); "I don't know if I am being funny. But it seemed more interested in what is going on with Bri than what actually happened to me today" (sent 10/3/2012). *State v. Williams*, 38 Ohio St.3d 346, 350, 528 N.E.2d 910 (1988) (the erroneous admission of hearsay, cumulative to the testimony of other witnesses at trial, constitutes harmless error).

{¶119} The second assignment of error is without merit.

{¶120} In his third assignment of error, Kevin argues the trial court erred in denying his Motion to Suppress with respect to the search warrant, issued on November 20, 2012, allowing police to search electronic devices seized at the scene of the murder. Kevin contends that the warrant was not supported by probable cause and lacked particularity. Kevin further argues that the text messages retrieved from Lisa's iPhone constituted inadmissible hearsay.

{¶121} "For a search warrant to issue, the evidence must be sufficient for the magistrate to conclude that there is a fair probability that evidence of a crime will be found in a particular place. The reviewing court then must ensure that the magistrate

30

had a substantial basis for concluding that probable cause existed." *State v. Castagnola*, __ Ohio St.3d __, 2015-Ohio-1565, __ N.E.2d __, ¶ 35.

{¶122} "In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph one of the syllabus, citing *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

> In reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a *de novo* determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant. Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant.

*Id.* at paragraph two of the syllabus.

{¶123} In the present case, Detective Parmertor's probable cause affidavit, sworn four days after the murder, stated that the suspect (Zunich) "did not have any recollection of the incident that took place between her and the victim, Lisa Knoefel." Zunich did "recall being in Lisa's bedroom to go into Lisa's bathroom to get Ibuprofen." On the morning of the murder, a number of electronic devices had been seized, including three cell phones that "were located in the master bedroom where the incident took place and the victim * * * was found." Based on his training and experience, Parmertor stated that young persons of Zunich's age "commonly communicate with friends, family and confidantes via cell phone * * *." In light of Zunich's inability to "remember the incident," it was "integral to the investigation to be able to analyze any and all electronic communications via cell phone * * *," inasmuch as "probable cause exists that evidence of [Aggravated Murder] may be located in the items described."

{¶124} Kevin maintains the affidavit is deficient, in that there was "absolutely zero support for a judge or magistrate * * * to believe that any of the electronic devices listed in the affidavit contained evidence of the crime of murder." Appellant's brief at 17.[2] We disagree. Both the suspect and the victim were placed in the bedroom where the cell phones, whose ownership had not been determined, were found. The suspect and victim lived in the same home and, it could be reasonably inferred, conferred by cell phone. There was no question about whether a crime had been committed. Rather,

_____

2. The State argues that Kevin lacked standing to challenge the search of Lisa's cell phone, despite the fact that the service was in Kevin's name. *Marion v. Brewer*, 3rd Dist. Marion No. 9-08-12, 2008-Ohio-5401, ¶ 8 ("ownership of the property searched does not, in and of itself, establish standing to challenge a search or seizure"). However, the State did not raise this argument in the trial court, and this particular challenge was submitted to the court on the briefs without any sort of evidentiary record being created. Accordingly, we cannot consider the State's argument as to standing.

the question was whether there was a "fair probability" that evidence relating to the murder would be found on the phones. The trial court's determination that such evidence probably existed was reasonable in light of the circumstances, and entitled to the deference to be accorded in doubtful cases.

{¶125} Kevin likewise challenges the particularity of the search warrant. In addressing the particularity requirement of the Fourth Amendment, courts must consider "whether the warrant provides sufficient information to 'guide and control' the judgment of the executing officer in what to seize," and "whether the category as specified is too broad in that it includes items that should not be seized." (Citations omitted.) *Castagnola*, 2015-Ohio-1565, at ¶ 79.

{¶126} In the present case, the search warrant, in relevant part, describes the items to be searched as follows:

> central processing units, SIM card, screen, processor chips and/or any other storage device, assigned phone number for cell phone device; all stored text messages, images, photographs, e-mails, recently dialed telephone numbers, both incoming and outgoing calls, address books/contacts lists and any other electronic, digital information, or data stored in electronic form, including read and unread data and/or erased/deleted messages and/or images, stored in all phones * * * concealed in: one (1) black Apple iPhone * * *; one (1) blue/gray Samsung cell phone, * * *; one (1) black ZTE cell phone * * *.

**{¶127}** Kevin contends that the search warrant "in no way gives any guidance or control to the judgment of the individual performing the search," as it "allows the individual performing the search to seize practically anything and everything found in any place on the electronic devices covered by the warrant." Appellant's reply brief at 6.

**{¶128}** Reduced to its essentials, the search warrant authorizes a search of the cell phones found at the scene of the murder for anything in connection with the crimes of Murder and/or Aggravated Murder. The warrant is broad in that it authorizes the police to search the entire contents of the phone, but this does not mean that the warrant lacks specificity. There is nothing inherently improper about the authorization to search the entire contents of the phones, provided, as shown above, that there is a fair probability of finding evidence relating to the murder.

**{¶129}** The present case is distinguishable from *Castagnola*, relied upon by Kevin, by the fact that, in *Castagnola*, the police knew much more about the object of the search and so were capable of providing greater particularity. The particularity demanded from a search warrant is contingent upon the government's knowledge and the particular circumstances of the case. *Castagnola*, 2015-Ohio-1565, at ¶ 80. "A search warrant must particularly describe the things to be seized, but the description, whose specificity will vary with the circumstances of the case, will be 'valid if it is as specific as the circumstances and the nature of the activity under investigation permit.'" (Citation omitted.) *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir.2001).

**{¶130}** In *Castagnola*, the police believed the suspect had obtained the victim's address through an online search and the detective who obtained the warrant "knew that an online search would create 'a cookie, which will tell you where [the persons who

have used the computer] have been, what searches they have done, things of that nature,'" and believed that such information "would be useful in the prosecution of the alleged offenses." *Castagnola* at ¶ 86. In the present case, by contrast, the police did not know who the phones belonged to, the victim was dead, the suspect claimed no memory of the events, and there was no apparent motive for the crime. While Kevin pejoratively characterizes the search of the phones as a "fishing expedition," it is not, for that reason, violative of the Constitution.

{¶131} Finally, under this assignment of error, Kevin challenges the admission of the text messages as hearsay. He claims that the following messages, "I don't think we can fix anything anymore. Ur mind is set and so is mine" (sent 11/10/2012), and "This will not work out you have to choose" (sent 11/10/2012), were offered "to show that Lisa did, in fact, believe that their minds were set and could not be changed with regard to the issues in her marriage to Mr. Knoefel." Appellant's brief at 20-21.

{¶132} The text messages cited by Kevin, as well as other similar messages in the record, constitute an exception to the hearsay rule as "[a] statement of the declarant's then existing state of mind." Evid.R. 803(3). Under this exception, the Ohio Supreme Court has held that a murder victim's "statements that she was feeling stressed and was afraid of appellant" and that she intended "to separate and end the marriage" were "relevant to prove her intent to end the marriage" and "properly admitted as evidence * * * of a declarant's 'then existing state of mind'." *State v. O'Neal*, 87 Ohio St.3d 402, 411, 721 N.E.2d 73 (2000). *Also State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 100 ("testimony that four days before the murder, [the victim] had said she intended to end her relationship with Leonard because he had

35

fathered a second child by Penny McBride * * * was admissible as a statement of [the victim's] then existing mental condition"); *State v. Emrath*, 5th Dist. Richland No. 12CA110, 2013-Ohio-4231, ¶ 31 ("[the victim's] statements to Jazzette that she and appellant had been arguing and she planned to leave appellant were admissible under Evid.R. 803(3)").

**{¶133}** The third assignment of error is without merit.

**{¶134}** Under the fourth assignment of error, Kevin maintains that the trial court erred by overruling his motion for acquittal with respect to Count 3 of the Indictment.

**{¶135}** "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."  Crim.R. 29(A).

**{¶136}** "A 'sufficiency' argument raises a question of law as to whether the prosecution offered some evidence concerning each element of the charged offense." *State v. Brown*, 11th Dist. Lake No. 2014-L-032, 2015-Ohio-950, ¶ 29.  "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**{¶137}** "[I]n a sufficiency-of-the-evidence inquiry," the reviewing court is required to "constru[e] the evidence most strongly in the prosecution's favor."  *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 79.

{¶138} Count 3 of the Indictment charged Kevin with Sexual Battery as follows: "On or between the 1st day of March, 2012 and the 26th day of October, 2012, in Lake County * * * KEVIN D. KNOEFEL did engage in sexual conduct, to wit: intercourse, with a minor female victim, to wit: Sabrina Zunich * * *."

{¶139} We disagree that the evidence is insufficient to prove that Kevin and Zunich engaged in sexual intercourse prior to her eighteenth birthday on October 27.

{¶140} Zunich testified that her first sexual activity, i.e., masturbation, with Kevin occurred during a camping trip in early 2012. She described her sexual relations with Kevin from April to August 2012 as "not sex yet but foreplay * * * blow jobs and masturbation." Zunich was subsequently asked: "So after your 18th birthday, * * * can you describe for us whether or not your intimate relationship with the defendant changed in any way?" Zunich replied: "Yes * * * we had sex" meaning "penis into the vagina." Subsequently, however, the prosecutor returned to the issue of Zunich and Kevin having "sex," meaning vaginal intercourse. Zunich described various locations where they had engaged in sexual intercourse. The prosecutor then asked Zunich, "And how old were you during this period of time that we're talking about?" Zunich replied, "I was 17 and 18."

{¶141} Construing this evidence in the prosecution's favor, Zunich's testimony is that from April to August 2012 she and Kevin engaged in sexual activity, but not vaginal intercourse. After August 2012, while she was still seventeen, and after she turned eighteen, they engaged in vaginal intercourse. Thus, there was direct testimonial evidence to support Count 3 of the Indictment for Sexual Battery.

{¶142} The fourth assignment of error is without merit.

37

**{¶143}** In the fifth assignment of error, Kevin argues that all Counts of the Indictment were against the manifest weight of the evidence.

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

> The court [of appeals], reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

*Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

38

{¶144} "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley v. Volkmon*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21; *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 fn. 3, 461 N.E.2d 1273 (1984) ("every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts") (citation omitted).

{¶145} Kevin's arguments under this assignment of error all focus on the reliability and credibility of Zunich as a witness. Kevin characterizes her testimony as to the Sexual Battery Counts as "general assertions that [they] engaged in intercourse [or fellatio or digital penetration] at unknown times in various rooms of the house." Appellant's brief at 28. Similarly, Kevin characterizes Zunich's testimony as to the Conspiracy and Complicity Counts as "contradicted by her own testimony or by the testimony of another witness." *Id.* at 29. Kevin notes in particular: Zunich testified that the point of the gun plot was to kill Lisa using a weapon that could not be traced to Kevin, yet the gun Zunich identified was registered to Kevin; Zunich's and Pavlik's testimony regarding the hit man plot contradicted each other; and Zunich's testimony regarding the chronology of the plot involving the bread knife was internally inconsistent.

{¶146} While there were numerous instances where a jury could reasonably doubt portions of Zunich's testimony, the jury's decision to credit her testimony does not create such a manifest miscarriage of justice as to justify reversing Kevin's convictions. We note that there was a great abundance of circumstantial evidence corroborating the essential aspects of Zunich's testimony. Kevin owned a large number of guns and admitted to Pavlik, in a recorded conversation, that if he was going to kill someone he

39

would use a gun.  Zunich and Pavlik agreed that there was a plot to hire a hit man to kill Lisa.  Several witnesses corroborated Zunich's awareness of the Knoefels' marital problems and of the amount of life insurance on Lisa's life.  Several witnesses testified as to their own suspicions about the nature of Kevin and Zunich's relationship.  Kevin's conduct before and after the murder suggested an improper relationship between them.  In sum, there are no compelling arguments to rebut the presumption in favor of the finder of fact's judgment on the evidence.

{¶147} We note that a defendant does not compromise his presumption of innocence by exercising the privilege to remain silent.  The Ohio Supreme Court has recognized that the "[u]se of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination."  *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, syllabus.  The reason is that the right to silence:

> reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load;" our respect for the

inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life;" our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent."

(Citation omitted.) *Id.* at ¶ 30. Simply put, a person is under no legal duty to discuss his personal affairs with anyone. The mere fact that a person elects not to address a question or accusation, does not demonstrate guilt. There is no such concept as an admission by silence under constitutional or criminal law. Accordingly, it is emphasized that it was Kevin's conduct following Lisa's murder which corroborates Zunich's testimony.

{¶148} The fifth assignment of error is without merit.

{¶149} Under the sixth assignment of error, Kevin contends that he was deprived of constitutionally effective assistance of counsel.

{¶150} To reverse a conviction for ineffective assistance of counsel, the defendant must prove "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "There is a strong presumption that the attorney's performance was reasonable." (Citation omitted.) *State v. Vanderhoof*, 11th Dist. Lake No. 2013-L-036, 2015-Ohio-2198, ¶ 9.

41

{¶151} Kevin contends that trial counsel was ineffective "as he was not familiar with the discovery provided by the State, he was so disorganized that he objected to a question that he asked, and failed to call Ms. Zunich's treating psychologist near the time of the murder."

{¶152} The instances of purportedly ineffective assistance cited by Kevin do not demonstrate that trial counsel's performance was deficient or prejudicial to Kevin's interests.

{¶153} With respect to discovery, trial counsel had, just before trial, received an audio recording from the emergency room where Zunich was taken in which one of the physicians suggested that she was on ecstasy. Counsel wanted the State to identify the medical providers in the recording and, apparently, this information already existed in medical records previously turned over in discovery. As trial counsel had admittedly only recently received the recording, we find no deficiency in his failure to search prior discovery for additional records that would have explained the recording. Kevin cites another instance where trial counsel attempted to subpoena medical records containing information that had already been provided.

{¶154} With respect to trial counsel objecting to his own question, it should be noted that the witness (Zunich) was responding with hearsay, "when I first got there he told me that the only reason --." In any event, the decision to retract a question in the course of a nine-day trial is not remarkable.

{¶155} Finally, trial counsel's decision not to call Zunich's treating psychologist at the time of the murder, in the absence of any indication as to how her testimony would have benefited Kevin, cannot be deemed ineffective. The trial court had made it clear

during the course of the trial that questions regarding Zunich's psychological health would be limited and evidence of her current diagnoses, bipolar, ADHD, and PTSD, were already in evidence. There was also evidence from other witnesses that Zunich's psychological conditions were under control. Trial counsel could have reasonably concluded that further testimony that Zunich's conduct was not the result of psychological illness would not have bolstered the defense case that she killed Lisa on her own initiative.

{¶156} The sixth assignment of error is without merit.

{¶157} In the seventh and final assignment of error, Kevin argues that "numerous instances of error that permeated the entire trial," such as the admission of "multiple prejudicial hearsay statements," "recorded phone conversations * * * in violation of California law," and "no other overwhelming evidence of conviction," had a cumulative effect depriving Kevin of a fair trial. Appellant's brief at 34-35.

{¶158} As discussed in the prior assignments of error, very little of the evidence objected to was admitted in error or was unfairly prejudicial. The effect of any error was negligible. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995) ("doctrine [of cumulative error] is not applicable" where the reviewing court does "not find multiple instances of harmless error").

{¶159} The seventh assignment of error is without merit.

{¶160} For the foregoing reasons, Kevin's convictions are affirmed. Costs to be taxed against the appellant.

COLLEEN MARY O'TOOLE, J., concurs in judgment only,

CYNTHIA WESTCOTT RICE, J., concurs in judgment only with a Concurring Opinion.

43

_____

CYNTHIA WESTCOTT RICE, J., concurs in judgment only with a Concurring Opinion.

{¶161} I concur in the judgment only based upon the outcome of the assignments of error before the court. I write separately to address the sixth assignment of error challenging the effectiveness of trial counsel.

{¶162} The State's case is founded on the testimony of the co-defendant, Sabrina Zunich. The record is replete with efforts the defense made to introduce the extensive mental health problems the co-defendant experienced prior to her placement in the victim's foster care. The trial court excluded this testimony, finding the prior mental health issues were too remote in time to the offense. I mention this in response to appellant's challenge to trial counsel's effectiveness. It is clear that the decision not to call her current mental health provider was a conscious trial strategy. Decisions on **strategy** and trial tactics are generally granted wide latitude in professional judgment, and it is not the duty of an appellate court to analyze trial counsel's legal tactics. *State v. Gau*, 11th Dist. Ashtabula No. 2005-A-0082, 2006-Ohio-6531, ¶35, citing *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Debatable trial tactics and **strategies** do not constitute **ineffective** assistance of counsel. *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995), citing *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980).

{¶163} Based upon the continued objections the defense raised in response to the trial court's decision to exclude her prior mental health history, it is clear that defense counsel did not inadvertently exclude this witness' testimony.

44