[Cite as *State v. Starkey*, 2017-Ohio-9327.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2017-A-0022** |
| KYLE W. M. STARKEY, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2015 CR 00487.

Judgment: Affirmed.

*Nicholas A. Iarocci,* Ashtabula County Prosecutor, and *Shelley M. Pratt,* Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Thomas Rein,* 820 West Superior Avenue, 820 Building, Suite 940, Cleveland, OH 44114 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Kyle W. M. Starkey, appeals his convictions and sentence for Murder, Felonious Assault, Tampering with Evidence, and Domestic Violence, following a jury trial in the Ashtabula County Court of Common Pleas. The issues to be determined by this court are whether convictions for Assault and Murder are supported by the weight and sufficiency of the evidence when there is witness testimony that the defendant hit the victim until she died; whether consecutive

sentences are properly ordered when the sentencing judgment does not state the exact language of the required statutory findings; whether a motion to change venue is properly denied when the court dismisses for cause any jurors who stated they could not be fair in light of pretrial publicity; whether a trial court errs by excluding testimony about a witness' general untruthfulness on a matter unrelated to the crimes at issue; and whether a court must make a finding that a defendant has an ability to pay court costs. For the following reasons, we affirm the judgment of the court below.

{¶2} On September 2, 2015, the Ashtabula County Grand Jury issued an Indictment, charging Starkey with Murder (Count One), an unclassified felony, in violation of R.C. 2903.02(A); Murder (Count Two), an unclassified felony, in violation of R.C. 2903.02(B); Felonious Assault (Count Three), a felony of the second degree, in violation of R.C. 2903.11(A)(1); Tampering with Evidence (Count Four), a felony of the third degree, in violation of R.C. 2921.12(A)(1); Gross Abuse of a Corpse (Count Five), a felony of the fifth degree, in violation of R.C. 2927.01(B); and Domestic Violence (Count Six), a misdemeanor of the first degree, in violation of R.C. 2919.25(A).

{¶3} Prior to trial, Starkey moved for a change of venue, which was denied. A trial was held before a jury on March 20-29, 2017. The following pertinent testimony and evidence were presented:

{¶4} Glenna Patton, a friend and coworker of the victim, Mandy Gottschalk, testified that on August 14, 2015, she arrived at Gottschalk's house on Washington Avenue, in Ashtabula to go out for the night. Gottschalk shared the home with Starkey, who was her boyfriend. When Patton arrived at the home, Gottschalk, Starkey, and a friend, Ryan McBride, entered her vehicle. McBride and Starkey had a bookbag full of

2

beer. Patton drove to Geneva on the Lake, where she dropped off McBride and Starkey at a park.

{¶5} Patton and Gottschalk proceeded to several bars in the area. Later that evening, they saw Starkey and McBride at a bar with two females. Patton observed Starkey "flirting" with the girls. Patton indicated that Gottschalk became jealous and angry and had a conversation with Starkey, which she did not hear. The two eventually ended the discussion and kissed. Patton and Gottschalk left the bar, and at around 1 a.m. drove back to Ashtabula. Patton dropped Gottschalk off at her house around 1:30 or 2 a.m.

{¶6} Regarding Starkey and Gottschalk's relationship, Patton described that Starkey called Gottschalk derogatory names and had once pulled her breasts out of her shirt in front of friends. She also described an incident during a "dark humor" game when Starkey indicated that "if he ever killed somebody he had a blue tarp and would wrap them up in plastic and bury them close until he had a chance to move them." She also testified that a few weeks before Gottschalk's death, Starkey had been looking for an apartment and had said he was "tired" of Gottschalk.

{¶7} Patton learned Gottschalk was missing on August 16 and went with Starkey to report her missing a few days later. Afterward, he requested that Patton drive him to various locations, saying he wanted "to make sure that her body wasn't there." The night before Gottschalk's body was discovered, Starkey came to Patton's apartment and was anxious, shaking, and sweating.

{¶8} Patton indicated that the police had towed her car "just to see if anything was committed in the car." She conceded that she had not told police about Starkey's statements regarding the tarp or insults to Gottschalk.

{¶9} Ryan McBride, Starkey's friend and coworker, testified that he was with Starkey on the night of August 14 into the early morning of August 15, after being dropped off in Geneva on the Lake by Patton and Gottschalk. The men met two women that night and later ran into Patton and Gottschalk at a bar. Gottschalk "looked upset" because Starkey was with another woman. Later, the two men took a taxi back to Starkey and Gottschalk's home, arriving around 3:00 or 3:30 a.m.

{¶10} According to McBride's testimony, he knocked on the front door, which Gottschalk did not immediately answer. Starkey then began kicking the door and kicked it open. Gottschalk was standing near the door, trying to open it. McBride testified that Starkey entered and began punching Gottschalk with his fist until she fell onto the couch. He continued to punch her and when McBride tried to intervene, he threatened him with a switchblade knife. Starkey threw Gottschalk to the floor and called her a bitch, continued to hit her head and kicked her in the stomach. Starkey said, "she does this all the time" and "she knows what she's done." When Starkey stopped attacking Gottschalk, McBride could tell she was dead. Starkey began crying and said, "I can't believe this happened" and "I don't know what I did."

{¶11} According to McBride, Starkey told him to help clean the house. Starkey used bleach to clean up blood in the living room where the attack occurred and the two wore latex gloves. Starkey dragged Gottschalk to the bathroom, put her in a closet, and padlocked the door.

4

{¶12} Later that day, August 15, the men spent time with the two women from the prior night. The next day, Gottschalk's mom and the police came to the home looking for her, but did not enter the house. On August 17, Starkey told McBride they needed to bury Gottschalk. Starkey removed her clothing and wrapped her in a tarp, which he had just removed from the package, while McBride put duct tape over her legs. She was placed in a trash can and the two took her across the street by abandoned buildings in a wooded area. Starkey dug a grave, removed her from the tarp, placed her inside, filled the grave and put branches over it. He placed the tarp in the trash can, returned it to the home, and put the shovels used to dig the grave under the porch. McBride identified items presented as evidence that were used, including gloves, the tarp, and duct tape.

{¶13} McBride testified that he had reached a plea deal in relation to his participation in the crime, agreeing to a five-year prison sentence. He admitted that when first interviewed by police he was dishonest because he was scared and admitted that he did not provide all of the details of the incident initially.

{¶14} Trisha Furman, Gottschalk's coworker and friend, testified that the couple would sometimes get in "heated arguments." On August 17, Furman was filling out paperwork with Starkey at their place of employment. When listing beneficiaries, Starkey indicated that he didn't have anyone. When Furman inquired about Gottschalk, he said "fuck that bitch" and did not mention she was missing. The company's human resources assistant, Michelle Childs, also testified that Starkey made that statement.

{¶15} Regenea Brazil, Gottschalk and Starkey's coworker, also testified that Starkey said while playing a game with friends that he "had a tarp big enough to hide a

5

body if he needed to." She went to the Washington Avenue house a few days after Gottschalk went missing but did not notice or smell anything unusual.

{¶16} Stacie Vencill, Gottschalk's friend, went to her house on August 19 after learning she was missing, and described Starkey's demeanor as cold and lacking emotion. During a search conducted on August 21, Vencill observed Starkey briefly enter a wooded area near his house, close to where the body was ultimately discovered. When she saw Starkey again on August 23, he was agitated and at one point asked "they can't get a search warrant without circumstantial evidence, right?"

{¶17} On August 19, Sergeant Brian Cumberledge went to Starkey and Gottschalk's residence. He noticed gnats inside the home, as well as Gottschalk's purse, identification, and inhaler.

{¶18} Two detectives, Lieutenant Dennis Dibble and Lieutenant Joseph Cellitti, investigated further on August 20. They went to the abandoned Zehrco Plastics property across from Starkey and Gottschalk's home but did not find anything. They also entered the house but did not notice anything abnormal.

{¶19} On August 21, Karen Allison, who lives on Riverside Drive in Ashtabula, described finding a backpack near her yard outside, which contained items such as a tarp and gloves. While looking at the backpack, Starkey, whose stepmother lived next door, asked what she was doing. After she went inside, she saw Starkey looking inside the backpack. Allison called the police and while waiting, Starkey mentioned his girlfriend was missing, that he saw her bra in the backpack, and said "he thinks he was being set up." Starkey offered to the police to throw the items away.

6

{¶20} Patrolman Donald Martin of the City of Ashtabula Police Department responded to Allison's call. As he approached the backpack, he could smell a "rancid odor" similar to a dead carcass and saw maggots crawling inside of the bag. The bag contained a tarp, pieces of duct tape, a bandana, a black bra, ear plugs, a utility knife, and rubber gloves.

{¶21} Stacey Weatherbee, Starkey's stepmother, went to pick up Gottschalk for work on August 17, at which time Starkey indicated that he did not know where she was, that they had gotten into an argument and she was gone when he got home on Friday. On the date the backpack was discovered, Starkey came inside and said "he was gonna go to prison" because they found the backpack and that "somebody's trying to set me up." Weatherbee said she recognized the backpack as Starkey's "work bag." She identified some of the items inside as his, including the earplugs.

{¶22} Sergeant Brian Cumberledge testified that he decided to search the abandoned Zehrco Plastics area across from Starkey's home after speaking with Patton. On August 24, Deputy Evan Wolff observed a mound of dirt covered with branches. He noticed a piece of duct tape nearby and then observed two toes protruding through the dirt. Detective Sean Ward excavated the body, which was ultimately found to be Gottschalk's.

{¶23} Justin Soroka, a special agent with the Ohio Bureau of Criminal Investigation (BCI) testified that he and other agents investigated the crime scene at the Washington Avenue home on August 25. A search revealed various items, including two shovels under the porch, a trash can in the rear of the residence, and an empty box of vinyl gloves under the sink. Items found in the trash can outside included a towel,

7

cleaner, gloves, and a wrapper for a tarp. Soroka observed reddish brown stains consistent with blood on various items inside the house, including work boots, an office chair, carpet near the bathroom, and on the walls and shoe rack near the front door. He also testified that it looked as though the front door had been damaged. A piece of duct tape on the floor near the master bedroom was collected.

{¶24} Brenda Butler, a former BCI special agent, performed a blood stain pattern analysis at the Washington Avenue home. She identified various areas of blood spatter in the living room, near the front door, and diluted blood spatter near the bathroom sink. An application of luminol indicated that there was a "blood shedding event" in the doorway area of the living room. She also determined that there was an attempt to clean up blood in areas near the front door and the bathroom. Butler did not see an indication of bleach being used to clean.

{¶25} Kylie Graham, a BCI forensic scientist, testified that blood on the walls of the home was tested and belonged to Gottschalk. Many other items Graham tested for DNA were "not sufficient for comparison," but Starkey's DNA was on duct tape found inside of the home and the bandana in the bookbag.

{¶26} Daniel Davison, a BCI forensic scientist, analyzed the various pieces of duct tape found in this case and testified that they "could have come from the same source" but other rolls of tape could share the same characteristics. He stated that "I can only say with certainty that I can't tell these pieces apart."

{¶27} Hallie Dreyer, a BCI forensic scientist, performed a type of DNA testing called YSTR testing on some evidence. She obtained a profile consistent with Starkey on some items, such as a glove in the backpack and stains in the home, although these

8

profiles were limited. The rarity of the profile for the glove was one in every one-hundred and twenty-eight unrelated males and the stains were within several thousands of unrelated males.

{¶28} Dr. Joseph Felo, the chief deputy medical examiner for the Cuyahoga County Medical Examiner's Office, testified regarding the autopsy, which was performed by another individual, Amanda Maskovyak, who has since moved. He was present for a "large percentage" of the autopsy and discussed the findings with Maskovyak. Dr. Felo testified that Gottschalk had various fractures including to her jaw, hyoid bone, cartilage and four ribs. She also had several bruises and a tear in the tissues supporting her intestines, which he believed occurred while she was alive. He opined that Gottschalk "died because of blunt impacts to [her] head, neck, trunk, and extremities, with skeletal and visceral injuries."

{¶29} Dr. Pamela Lancaster, the Ashtabula County Coroner, reviewed the case and opined that Gottschalk "died from blunt trauma to her head and trunk, extremities" and that the manner of death was homicide.

{¶30} Chris Boucher, who met Starkey while in jail in September 2015, testified that Starkey said "his hands were lethal weapons, especially now." Boucher also "heard him mention one time that it'd be hard for him to move a trash can by himself with a body in it."

{¶31} The defense presented the testimony of Starkey and Gottschalk's neighbors, Alexander VanGorder and David VanGorder, who testified they did not hear anything unusual on Monday or Tuesday, around the time the body was alleged to have

9

been buried. Another neighbor, Toccara Jones, heard loud vehicle noises during the early morning hours of August 15, but nothing unusual.

{¶32} Dr. Werner Spitz, a pathologist with a sub-specialty in forensic pathology, testified for the defense. He believed that some areas described as bruises occurred after death, and that there was not an injury to Gottschalk's bowel during her life. He testified that he could not determine what the cause of death was in this case.

{¶33} David Ward, Gottschalk's cousin, testified that on August 23, he went to Gottschalk's home to look for his cousin as well as any evidence and went through the home. Matt Pirigyi, Gottschalk's ex-boyfriend and the father of their two children, went into the house with Ward. Pirigyi's girlfriend, Kimberly Malkin, testified that while Gottschalk was missing, he spent several hours every day looking for her.

{¶34} At the close of the evidence, the trial court found that "there was not enough evidence" to have the jury consider Counts One and Five. The remaining counts were submitted to the jury.

{¶35} On March 30, 2017, the jury found Starkey guilty of the remaining counts as charged in the Indictment. This was memorialized in a March 31, 2017 Judgment Entry.

{¶36} A sentencing hearing was held on March 31, 2017, at which the court noted the recent violent crimes that had been committed by Starkey in a separate case, which also involved beating a female victim. The court determined that Counts Two, Three and Six were allied offenses and the State elected to proceed on Count Two. The court sentenced Starkey to fifteen years to life on Count Two and 36 months on Count Four, ordering the sentences to be served consecutively and consecutive to a

10

prior sentence in Ashtabula County Court of Common Pleas Case No. 2015 CR 588. The trial court filed its Judgment Entry of Sentence on April 4, 2017.

**{¶37}** Starkey timely appeals and raises the following assignments of error:

**{¶38}** "[1.] The state failed to present sufficient evidence to sustain a conviction against appellant.

**{¶39}** "[2.] Appellant's convictions are against the manifest weight of the evidence.

**{¶40}** "[3.] The trial court erred by ordering appellant to serve a consecutive sentence without making the appropriate findings required by R.C. 2929.14 and HB 86.

**{¶41}** "[4.] The trial court erred by not granting appellant's motion for a change of venue.

**{¶42}** "[5.] The trial court erred in violation of the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution which provide rights to confrontation and cross-examination when it did not permit appellant to inquire about the rape allegations made by the victim to the police in this case.

**{¶43}** "[6.] The court costs imposed at the sentencing hearing infringes [sic] upon appellant's rights under the Eighth and Fourteenth Amendments to the United States Constitution, R.C. 2929.18, R.C. 2929(B)(5) [sic], and related sections of the Ohio Constitution."

**{¶44}** We will consider the first and second assignments of error jointly, as they relate to the weight and sufficiency of the evidence.

**{¶45}** In reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**{¶46}** Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "[A] reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* An appellate court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Thompkins* at 387.

**{¶47}** As Starkey generally argues that each of the convictions was unsupported by the evidence, we will consider each offense for which he was convicted.

**{¶48}** Three of the offenses relate directly to the physical attack on Gottschalk. In relation to Murder, the State was required to prove, beyond a reasonable doubt that he caused her death "as a proximate result of * * * committing or attempting to commit an offense of violence that is a felony of the first or second degree," i.e., Felonious Assault. R.C. 2903.02(B). For Felonious Assault, the State was required to prove that

12

he knowingly did "[c]ause serious physical harm to another." R.C. 2903.11(A)(1). For Domestic Violence, the State was required to prove that he did "knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(A).

{¶49} The State presented sufficient evidence to support each of these convictions. McBride testified that he observed Starkey hit and kick Gottschalk repeatedly until she was dead. Dr. Felo testified that her death was the result of blunt impacts to her head, neck, trunk, and extremities. Gottschalk's blood was found in the living room of the residence shared by her and Starkey, in the area where McBride described the attack occurring. Several witnesses testified that Starkey and Gottschalk had gotten into an argument that night about another female. Witnesses also testified that Starkey had been making negative comments about Gottschalk, was looking for a new apartment, and raised questions about his behavior after Gottschalk went missing. Witnesses also noted that he had previously made a comment about how he would use a tarp and bury the victim nearby if he killed someone. Both elements were demonstrated to be part of the crime.

{¶50} Various items that McBride testified were used in the murder and subsequent acts were found in a bookbag identified by several witnesses as belonging to Starkey. When considering this evidence, the elements of the foregoing crimes are supported by sufficient evidence. The testimony indicates that Starkey punched and kicked Gottschalk, causing the serious physical harm necessary for the second-degree Felonious Assault conviction. The commission of this assault resulted in her death, supporting the Murder conviction. Testimony demonstrated that Gottschalk and Starkey

13

were dating and living together, which provides the additional element necessary for the Domestic Violence conviction.

**{¶51}** Further, these crimes were supported by the weight of the evidence. Little contradictory evidence was presented to counter the version of events provided by McBride and the evidence that corroborated his story. The evidence outlined above weighs in favor of the jury's verdict. Testimony from various witnesses was supported either by that of other witnesses, physical evidence recovered by police, or by DNA evidence.

**{¶52}** Starkey primarily argues, both in relation to the weight and sufficiency of the evidence, that McBride's testimony was unreliable and contradictory. We initially emphasize that the issue of credibility of witnesses is for the trier of fact to determine. *State v. Banks*, 11th Dist. Lake No. 2012-L-110, 2013-Ohio-3865, ¶ 35; *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986) (the determination of a witness' credibility lies "with the finder of fact and an appellate court may not substitute its own judgment"). Further, "in a review of the sufficiency of the evidence, the court does not engage in a determination of the witnesses' credibility." *State v. Goff*, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998).

**{¶53}** While Starkey emphasizes that McBride's inconsistency should render his testimony lacking credibility, McBride's testimony actually weighs strongly in favor of conviction, as it was corroborated by other evidence. McBride testified that Starkey broke into the front door, and a photo and testimony demonstrated that there appeared to be damage to the door. McBride testified that two shovels were used to bury Gottschalk's body and that they were placed under the porch. Two shovels were

14

discovered under the porch. McBride testified that the attack on Gottschalk occurred in the living room, near the front door, and her blood was found in that area of the home. McBride's testimony was that they used latex-type gloves and an empty box of such gloves was recovered from under the sink. Finally, McBride testified that Starkey had unwrapped a new tarp and used it to wrap up Gottschalk's body. The package from a tarp was also recovered at the home. The details of how Gottschalk's body was handled and buried were also similar to the statements Starkey had previously made about what he would do with a body if he killed someone. The jury was certainly entitled to give the testimony great weight in light of these details.

{¶54} Starkey emphasizes that McBride told inconsistent versions of his story to police. While there may have been inconsistencies in different versions of the stories told by McBride, he admitted that he was scared. It is not uncommon for those involved in criminal activity to be dishonest when initially questioned by police. Minor issues raised with McBride's testimony, such as a lack of believability when he stated that Starkey was holding a knife while simultaneously hitting Gottschalk, are again factual determinations that the jury must make.

{¶55} Starkey argues that McBride made a deal with the State and minimized his involvement while "point[ing] the finger" at him. As this court has explained, even in cases where a witness may have something to gain, such as with a "jailhouse snitch," the credibility of that witness is left to the finder of fact. *State v. Weimer*, 11th Dist. Lake No. 2013-L-008, 2013-Ohio-5651, ¶ 68. Further, there is no evidence that McBride committed the assault nor that he had any reason to do so, while there was testimony about arguments and problems between Starkey and Gottschalk.

15

{¶56} Starkey also takes issue with the fact that police had entered the house on various occasions and not noticed foul play or an odor within the home. While this is one factor that could be weighed in his favor, it does not outweigh the foregoing evidence. Gottschalk's body was locked in a bathroom closet, and any odor may not have travelled to other areas where the police were. Further, the small areas of blood visible within the living room which were discovered upon later inspection may not have been immediately evident, especially in the poor lighting described by officers and the cluttered environment of the home.

{¶57} Starkey's contentions about Patton opining to police where the body might be discovered have no particular bearing on the weight of the evidence. Patton testified that she thought the body may be in the wooded area/Zehrco property because it was directly across the street from Starkey's home and was near abandoned industrial buildings. There is no evidence that she committed the crime rather than Starkey.

{¶58} The lack of cuts or injuries to Starkey's hands testified to by various witnesses also may have some value, but certainly is not conclusive. The testimony did not indicate that Gottschalk was able to protect herself or fight back, given the sudden barrage of punches and kicks to her body. When weighing the foregoing evidence together, we cannot find that the convictions relating to the assault and murder of Gottschalk were against the weight of the evidence.

{¶59} Finally, regarding Tampering with Evidence, the State was required to prove that Starkey, "knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted" did "[a]lter, destroy, conceal, or remove any

16

record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2921.12(A)(1).

{¶60} Starkey provides no particular argument in relation to this conviction. It is clear that items relating to the crime were removed and taken to a location away from the crime scene. He also cleaned the home, removing evidence relating to the act of the crime. In the absence of any specific argument as to why such a conviction was not supported by the evidence, aside from the arguments addressed above, we find no grounds for reversing this conviction either as against the weight of the evidence or as unsupported by sufficient evidence.

{¶61} The first and second assignments of error are without merit.

{¶62} In his third assignment of error, Starkey argues that the trial court erred in ordering him to serve consecutive sentences without making the required findings under R.C. 2929.14.

{¶63} "The court hearing an appeal [of a felony sentence] shall review the record, including the findings underlying the sentence or modification given by the sentencing court." R.C. 2953.08(G)(2). "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing * * * if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14, or * * * [t]hat the sentence is otherwise contrary to law." R.C. 2953.08(G)(2)(a) and (b).

{¶64} Pursuant to R.C. 2929.14(C)(4), separate prison terms for multiple offenses may be ordered to be served consecutively if the court finds it "necessary to

17

protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and if the court also finds any of the factors in R.C. 2929.14(C)(4)(a)-(c) are present. The pertinent factor in this case is whether "[t]he offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." R.C. 2929.14(C)(4)(c).

{¶65} While the trial court must make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate those findings into its sentencing entry, it is not "required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. "[A] word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29.

{¶66} Starkey argues that the trial court failed to make consecutive sentencing findings, although he does not discuss which findings were missing. At the sentencing hearing, the trial court stated that consecutive sentences were necessary to protect the public from future crime and to punish Starkey, and that they were not disproportionate to the seriousness of the conduct and the danger posed by Starkey to the public. It also stated: "Mr. Starkey's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by him." These

18

statements are consistent with each of the required findings under R.C. 2929.14(C)(4), including a (C)(4)(c) finding.  In its Judgment Entry of Sentence, the court restated each of those findings, although as to the final finding, it stated that the "nature" of Starkey's criminal conduct demonstrated that consecutive sentences are necessary to protect the public from future crime.

{¶67}  It is evident from a review of the sentencing hearing that the court made each of the necessary findings.  Although the Entry stated that the "nature of the criminal conduct" demonstrates the need to protect the public, the court clearly found at the hearing that Starkey's "history of criminal conduct" necessitated the consecutive sentences and described his prior crimes.  A review of the transcript and PSI indicate that Starkey was convicted of the Rape and Kidnapping of another victim within the past year, supporting the trial court's finding.  Since we can determine from the record that the court engaged in the correct analysis and had evidence to support the findings, although it worded its finding a bit differently in the Entry than at the sentencing hearing, the consecutive sentences are upheld.  *Bonnell* at ¶ 29; *State v. Arcuri*, 11th Dist. Trumbull No. 2015-T-0123, 2016-Ohio-8254, ¶ 89-90.

{¶68}  The third assignment of error is without merit.

{¶69}  In his fourth assignment of error, Starkey argues that the trial court erred by not granting his motion for a change of venue, since he "could not have received a fair trial by an impartial jury in Ashtabula County given the newspaper publicity in this case."

{¶70}  A motion for change of venue is governed by Crim.R. 18(B), which provides that "[u]pon the motion of any party * * * the court may transfer an action * * *

19

when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." The trial court's decision on whether to change the venue is evaluated under an abuse of discretion standard. *State v. Landrum*, 53 Ohio St.3d 107, 116, 559 N.E.2d 710 (1990).

**{¶71}** "Crim.R. 18(B) does not require a change of venue merely because of extensive pretrial publicity." *State v. McKinney*, 11th Dist. Trumbull No. 2007-T-0004, 2008-Ohio-3256, ¶ 150, citing *Landrum* at 116-117. "[A] careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality." (Citation omitted.) *Landrum* at 117. "A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. * * * Only in rare cases may prejudice be presumed." *State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001).

**{¶72}** In the present case, Starkey only generally argues that the pretrial publicity prevented him from having a fair trial. He fails to provide any argument to show that one or more of the jurors were actually biased. He has failed to cite to a statement from any of the jurors empaneled indicating that they could not be fair and impartial.

**{¶73}** While Starkey argues that there need not be identifiable prejudice when the totality of the circumstances raises "the probability of prejudice," no such circumstances existed here. A review of the record reveals that the issue of pretrial publicity was fully addressed and potential jurors were questioned about their exposure to this coverage. While many potential jurors indicated that they had seen such coverage, each of these jurors was individually questioned about his or her ability to be

fair in light of the coverage. Any jurors who expressed doubts about their ability to be fair were excused by the court for cause. Additionally, the vast majority of the jurors empaneled had not indicated affirmatively when asked during voir dire if they had seen media coverage. We do not find that the trial was unfair or that the denial of the request for a change of venue was an abuse of discretion.

**{¶74}** The fourth assignment of error is without merit.

**{¶75}** In his fifth assignment of error, Starkey argues that the trial court erred by not permitting cross-examination regarding text messages sent by McBride to one of the women he had met on the night prior to the murder, Diane Banas, relating to lies McBride may have told about being in the army.[1] He argues that his inability to cross-examine McBride about these lies denied him the right to confront his witness and to prove McBride's lack of credibility.

**{¶76}** The trial court ruled that cross-examination as to this issue was impermissible because Starkey could not attack McBride's general credibility in that manner, noting that it lacked relevance.

**{¶77}** "Cross-examination of a witness is a matter of right, but the 'extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.'" *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993), citing *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931).

**{¶78}** The Sixth Amendment of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to * * * be confronted with the

---

1. The text of the assignment of error itself discusses rape allegations made by the victim, which has no relation to the argument presented. We will consider the argument made within the analysis section of this assignment rather than the text of the error itself, as it seems to have been written in error.

witnesses against him * * *."  Article I, Section 10 of the Ohio Constitution provides, in relevant part: "In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel * * * [and] meet the witnesses face to face * * *."

{¶79} "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.  * * *  '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  (Citation omitted.)  (Emphais sic.)  *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *see also State v. Minier*, 11th Dist. Portage No. 2000-P-0025, 2001 WL 1149461, *2 (Sept. 28, 2001) ("[a] criminal defendant's right to confront and cross-examine a witness is not unlimited").  Furthermore, the "constitutional right to cross-examine adverse witnesses does not authorize defense counsel to disregard sound evidentiary rules."  *State v. Amburgey*, 33 Ohio St.3d 115, 117, 515 N.E.2d 92 (1987).

{¶80} Pursuant to Evid.R. 611(B), "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility."

{¶81} In the present matter, the court prohibited cross-examination that related to McBride's allegedly false claims to a few individuals that he had served in the military. This was of no relevance whatsoever to the crimes committed here or to his witnessing of the crimes.  Courts have found that cross-examination that is irrelevant, and only further serves to attack the credibility of a witness when there was otherwise "ample

22

opportunity" to attack credibility, is properly prohibited by the trial court. *State v. Cobb*, 181 Ohio App.3d 179, 184, 610 N.E.2d 1009 (9th Dist.1991); *see also State v. Lee*, 11th Dist. Trumbull No. 95-T-5371, 1997 WL 835072, *9 (Dec. 31, 1997) (no error was found when the trial court excluded questions about the witness' prior untruthfulness when it was unrelated to the subject of the trial). The trial court should not be required to permit unlimited testimony on any lie a witness has told in his entire life.

{¶82} Even if the trial court had erred in not permitting cross-examination as to this issue, such error would be harmless. Defense counsel was able to point to multiple inconsistencies in McBride's testimony and possibly showing one additional, unrelated lie would have little impact on the jury's verdict. *See State v. Knoefel*, 11th Dist. Lake No. 2014-L-088*, 2015-Ohio-5207, ¶ 118 (finding harmless error when cumulative evidence is excluded). Further, as extensively explained above, McBride's version of the events surrounding Gottschalk's murder is corroborated by various pieces of evidence from many different sources and evidence of any potential lie about his service in the military would not have changed the outcome.

{¶83} The fifth assignment of error is without merit.

{¶84} In his final assignment of error, Starkey argues that the trial court did not consider his ability to pay court costs when assessing them, citing R.C. 2929.19(B)(5).

{¶85} Pursuant to R.C. 2929.19(B)(5), "[b]efore imposing a financial sanction under section 2929.18 of the Revised Code or a fine under section 2929.32 of the Revised Code, the court shall consider the offender's present and future ability to pay the amount of the sanction or fine."

23

**{¶86}** As this court has held, "court costs are not financial sanctions." *State v. Taylor*, 2012-Ohio-3890, 974 N.E.2d 175, ¶ 48 (11th Dist.). In fact, R.C. 2947.23 requires a court to assess costs against all convicted defendants, although the court may waive payment assessed against indigent defendants. *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, 926 N.E.2d 278, ¶ 11. "Consequently, R.C. 2929.18 and R.C. 2929.19 are inapplicable to the imposition of costs and a court need not consider a defendant's ability to pay." *Taylor* at ¶ 48.

**{¶87}** For this reason, we reject Starkey's argument that R.C. 2929.19(5) was not followed by the trial court, as that statute is inapplicable. At issue in the present matter is solely the issue of court costs and the court was not required to determine Starkey's ability to pay. *See State v. Chionchio*, 11th Dist. Portage No. 2012-P-0057, 2013-Ohio-4296, ¶ 70 ("appellant's objection to the imposition of costs [in the absence of a finding of ability to pay] is not a relevant argument and is contrary to law").

**{¶88}** The sixth assignment of error is without merit.

**{¶89}** For the foregoing reasons, Starkey's convictions and sentence in the Ashtabula County Court of Common Pleas are affirmed. Costs to be taxed against the appellant.


THOMAS R. WRIGHT, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents.